**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **WILLIAMS WIRELESS TECHNOLOGIES, INC. and POLANSKY ELECTRONICS, LTD.,** | § § § § | |
| **Plaintiffs,** | § § | **Civil Action No. 4:06-cv-305-RAS-DDB** |
| **vs.** | § § | |
| | § | **JURY TRIAL DEMANDED** |
| **RESEARCH IN MOTION CORP., NOKIA INC., GENERAL MOTORS CORP., ROCKWELL COLLINS, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LP, and KYOCERA MITA AMERICA, INC.,** | § § § § § § § | |
| **Defendants.** | § | |

**DEFENDANTS' MOTION FOR SANCTIONS AND TO COMPEL FURTHER PATENT
RULE 3-1 PATENT INFRINGEMENT CONTENTIONS**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW DEFENDANTS RESEARCH IN MOTION CORPORATION ("RIM"), NOKIA INC. ("NOKIA"), GENERAL MOTORS CORPORATION ("GM"), SAMSUNG TELECOMMUNICATIONS AMERICA, LP ("SAMSUNG"), and KYOCERA WIRELESS CORP. ("KYOCERA") (COLLECTIVELY "DEFENDANTS"), and make and file their Joint Motion to Compel Further Patent Rule 3-1 Patent Infringement Contentions from Plaintiffs Williams Wireless Technologies Inc. and Polansky Electronics, Ltd. (collectively "Plaintiffs") under Local Rule 3-1:

## TABLE OF CONTENTS

I.    Introduction ...........................................................................................................1

II.   Relief Requested ...................................................................................................1

III.  Motion for Sanctions ...........................................................................................2

      A.   Plaintiffs Have Already Been Ordered to Supplement Their PICs..................2

      B.   Plaintiffs Have Failed to Comply with the Court's Orders ...........................4

      C.   Plaintiffs' Repeated Failures To Properly Investigate Their Claims................6

      D.   Plaintiffs' Actions Warrant Sanctions ............................................................9

IV.   Motion to Compel Further Supplementation of the Supplemental PICs .................10

      A.   Plaintiffs' Supplemental PICs Still Do Not Comply with P.R. 3-1.................10

           1.   Limitation from claim 1: "An interface to connect a data
                transfer device with a radio transceiver" .................................................12

           2.   Limitation from claim 1:  "a data bus to transfer one of said
                data signals between said device and the respective circuit"..............13

           3.   Limitation from claim 1: "Switch means to connect one of said
                circuits with said data bus"......................................................................15

           4.   Limitation from claim 1: "and control means to control said
                switch means".............................................................................................17

           5.   Limitation from claim 1: "said control means being responsive
                to a signal from said data transfer device" .............................................19

           6.   Limitation from claim 1:  "which is indicative of a change in
                the operational mode thereof" ..................................................................20

      B.   The Lack of Specificity of Plaintiffs' Supplemental PICs Demonstrates
           That Plaintiffs Had No Basis For Accusing Any Products of Any of the
           Defendants of Infringement ..................................................................................21

      C.   Plaintiffs Should Be Ordered to Supplement Their PICs Within Ten
           Days or Face Dismissal With Prejudice ............................................................22

V.    Conclusion ...........................................................................................................23

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aberegg v. Sabal*,
No. 4:06-CV-437, 2007 WL. 295636 (E.D. Tex. Jan. 29, 2007)............................9

*Am. Video Graphics*,
359 F. Supp. 2d 558, 560-61 (E.D. Tex. 2005)...............................................21, 22

*Anthony v. Marion County Gen. Hosp.*,
617 F.2d 1164 (5th Cir.1980) ...................................................................9

*ConnecTel, L.L.C. v. Cisco Sys., Inc.*,
391 F. Supp. 2d 526 (E.D. Tex. 2005)..........................................................11, 21

*Green v. Forney Eng'g Co.*,
589 F.2d 243 (5th Cir. 1979) ....................................................................9

*Lopez v. Aransas County Indep. School Dist.*,
570 F.2d 541 (5th Cir. 1978) ....................................................................9

*McCullough v. Lynaugh*,
835 F.2d 1126 FED. R. CIV. P. 41 (b)............................................................9

*McNeal v. Papasan*,
842 F.2d 787 (5th Cir. 1988) ....................................................................9

*Orion IP, LLC v. Staples, Inc.*,
407 F. Supp. 2d 815 (E.D. Tex. 2006).............................................................22

*Rogers v. Kroger Co.*,
669 F.2d 317 (5th Cir. 1982) ....................................................................9

*STMicroelectronics, Inc. v. Motorola, Inc.*,
308 F. Supp. 2d 754 (E.D. Tex. 2004)..............................................................11

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981 (Fed. Cir. 2000) ..............................21

## FEDERAL STATUTES

FED. R. CIV. P. 11 ..........................................................................................2, 8, 19, 21

## I.    <u>Introduction</u>

On January 31, 2007, the Court found Plaintiffs' original Patent Infringement Contentions ("PICs") deficient and ordered that Plaintiffs supplement their PICs after being provided "representative" products from each of the Defendants.  Between February 1, 2007 and February 13, 2007, each of the Defendants identified representative products, numbering 62 products in total.  Of the 62 identified representative products, Plaintiffs provided Supplemental PICs for only 11 products.[1]  These Supplemental PICs still fail to meet the standards set forth in the Local Patent Rules and fail to meet the requirements for specificity defined by the decisions of the Courts of the Eastern District of Texas.  For the following reasons, the Court should impose sanctions upon Plaintiffs for failing to comply with the Court's January 31, 2007 Order requiring supplementation of Plaintiffs' PICs for all identified representative products.

## II.    <u>Relief Requested</u>

Based upon Plaintiffs complete failure to comply with the Court's January 31, 2007 Order, Plaintiffs' blatant misrepresentations to the Court, and Plaintiffs' failure to perform an adequate pre-filing or post-filing investigation, all of which will be detailed below, Defendants respectfully request the Court to grant the following relief, and issue an order to include the following:

1.    The order should limit Plaintiffs' infringement allegations in the case to only the accused products for which Plaintiffs' provided claim charts in their Supplemental PICs. Accordingly, the order should relieve Defendants from their obligations to provide discovery on

---

[1] Plaintiffs provided one chart on representative product for Nokia (who had identified eleven products), three charts for each Kyocera (who had identified thirteen products), GM (who had identified one product), and Samsung (who had identified sixteen products), and one chart for RIM (who had identified eleven products).

any products for which Plaintiffs did not provide a specific charts in their Supplemental PICs, and only after those charts have been adequately supplemented.

2. As to the PICs that Plaintiffs have provided, going forward, the order should: a) preclude Plaintiffs from pursuing discovery or infringement allegations as to any specific devices and/or components (instrumentalities) specifically identified in their Supplemental PICs as meeting each claim element; b) preclude Plaintiffs from amending or adding additional instrumentalities; and c) relieve Defendants from an obligation to produce discovery on any instrumentalities other than those specifically identified in Plaintiffs' Supplemental PICs.

3. Where vague, Plaintiffs should be ordered to provide further specificity to bring their Supplemental PICs into compliance with the requirements of P.R. 3-1 within 10 days.

The Order should further include in the alternative that Plaintiffs' failure to sufficiently supplement within 10 days will result in an order dismissal of Plaintiffs' complaint as to each Defendant for Plaintiffs' failure to exhibit a sufficient basis for filing the present action under FED. R. CIV. P. 11, and for failure to comply with the Court's orders.

## III.    Motion for Sanctions

### A.    Plaintiffs Have Already Been Ordered to Supplement Their PICs

Plaintiffs served their original PICs on all Defendants on December 18, 2006. Plaintiffs' original PICs included only a single claim chart for each Defendant that purported to cover all accused products of that Defendant. In addition, Plaintiffs' original PIC claim charts did not adequately identify specific structures in the accused products. Instead, the PIC claim charts were vague, conclusory, and unmoored from any specific accused products. As a consequence, Defendants filed a motion to compel Plaintiffs to serve PICs in compliance with P.R. 3-1 and for relief from Defendants' obligation to produce documents under P.R. 3-4(a) until after Plaintiffs served PICs in compliance with the Local Patent Rules.

The Court held a telephonic hearing on Defendants' motion on January 30, 2007.  During the hearing, the Court concluded that Plaintiffs' PICs were insufficient.  The Court specifically stated:  "… I'm looking at the local patent rule which speaks to the charts, that a chart needs to specifically identify where each element of each asserted claim is found within the accused instrumentality.  I don't think the charts really do that sufficiently."[2]  The Court further ruled as follows:

> Mr. Mann:  Your Honor, with all due respect, sir, I'd like to go through the Claim Charts where I think we have complied.
>
> The Court:  I don't think you have.  I've gone over the Claim Charts and I think it's too general.  What, what would be the best way to do this I think would to be have you gentlemen get together.  …If you can go in and say, okay, Mr. Mann, as to these products can we agree upon some representative products and give us some more detailed information without having to do all of them to give them some of what they feel is fair notice.  …I do think, from my own personal opinion, I've had a lot of patent cases, that the Claim's Construction Chart does not comport entirely with our local rules.  It has to be more specific.  That's all I'm saying.  So when you file these cases you've got to comply."[3]

Accordingly, on January 31, 2007, the Court issued a written order adopting its findings, stating that "[a]fter considering the motions, the evidence, and the arguments of counsel, the Court finds Plaintiffs' claim construction charts do not entirely comport with the Local Patent Rules and that their preliminary patent infringement contentions require more specificity."[4]  The Court ordered the parties to meet and confer to identify a smaller list of accused products, and as to each product, the Court ordered Plaintiffs to provide separate, more specific PICs.  The Court also ordered the parties to report back to the Court regarding compliance with its Order.[5]

---

[2] Transcript of Telephonic Hearing, dated January 30, 2007, p. 17:7-12, attached as Ex. 1.

[3] *Id.* at p. 22:11-23:16.

[4] Court Order dated January 31, 2007, p. 1, attached as Ex. 2.

[5] *Id.*

Between February 1, 2007 and February 13, 2007, each of the Defendants identified a smaller subset of its own products as to which further specific PICs would be required.[6] Plaintiffs reported back to the Court that "Defendants have identified sixty-two separate products and have demanded separate claim charts as to each of those sixty-two products. **Plaintiffs are willing and prepared to provide such charts and can do so if given a reasonable time for their preparation**."[7]  Moreover, Plaintiffs represented that they would "provide revised charts **with respect to each product identified by Defendants.**"[8]  Over Defendants' objection, Plaintiffs requested four to six weeks to provide supplemental charts.

The Court rejected Plaintiffs' request for four to six weeks to provide supplemental charts.  Instead, the Court ordered "Plaintiffs to revise their Patent Infringement Contentions as to the 62 identified products by March 9, 2007 at 5:00 p.m."[9]

### B.    Plaintiffs Have Failed to Comply with the Court's Orders

Notwithstanding the Court's specific order for Plaintiffs to "revise their Patent Infringement Contentions as to the 62 identified products," on March 9, 2007, Plaintiffs served Supplemental PICs that addressed only a handful of specific products, and, even for those products, Plaintiffs failed to provide the detail and specificity required by the Patent Rules.[10]

To demonstrate the seriousness of Plaintiff's failure to comply with the Court's orders and the Patent Rules, a few examples are provided below:

---

[6] For example, defendant RIM identified eleven representative products, each representative product representing a group of products with structure, function and operation different from those of the other groups.  *See* Exs. 3 and 4, attached.

[7] Plaintiffs' Report to the Court dated February 14, 2007, ¶ 3 (emphasis added), attached as Ex. 5.

[8] *Id*. at ¶ 2 (emphasis added).

[9] Court Order dated February 23, 2007, p. 1, attached as Ex. 6.

[10] Plaintiffs Supplemental PICs are attached as Exs. 7 - 11.

- Plaintiffs were ordered to provide Supplemental PICs as to **each** of the 62 identified products. Plaintiffs instead provided a total of **twelve** infringement charts, and for some Defendants these charts were not tied to any specific product.

- Plaintiffs provided a series of charts, some of which are identical, purportedly broken-down by chipset with respect to each Defendant.

- Plaintiffs failed to provide any Supplemental PICs for Defendant Rockwell. Rockwell sought an explanation for the failure to supplement and was told that Plaintiffs were relying upon their initial, insufficient PICs, and that no supplementation would be forthcoming.

- Plaintiffs provided two charts for Nokia (who had identified eleven products), three charts for each Kyocera (who had identified thirteen products), GM (who had identified one product), and Samsung (who had identified sixteen products, representing sixteen distinctly different groups of products)[11], and one chart for RIM (who had identified eleven products, representing eleven distinctly different groups of products).

- As to Nokia, Plaintiffs provided only one chart not corresponding to any of the carefully selected eleven representative products, and one additional chart corresponding to a product not identified as representative but chosen by Plaintiffs for unknown reasons.

- As to RIM, the **single** claim chart provided by Plaintiffs is based upon Plaintiffs' baseless assertion that the representative product at issue (RIM's BlackBerry model 5790) contains an integrated circuit chipset called the Intel "PDCharm." Plaintiffs' claim chart demonstrates that they do not have, nor have they ever had, any factual basis upon which to bring this case against RIM, as neither RIM's BlackBerry model 5790 nor any other RIM product accused by Plaintiffs contain the Intel "PDCharm" chipset.[12] Nevertheless, even if Plaintiffs' erroneous identification of the "PDCharm" chipset had been correct, the remaining content of Plaintiffs' claim chart is so vague and ambiguous as to provide no specific guidance to RIM as to the instrumentalities alleged by Plaintiffs to meet the respective elements of the asserted claims.

---

[11] All of the charts provided for GM, Kyocera and Samsung are identical. In fact, the charts for the MSM5100 Chipset identify the "Onstar System[TM]" as an allegedly infringing instrumentality even though neither Kyocera nor Samsung manufacture the "Onstar System[TM]."

[12] As shown in the Declaration of Omar Barake of Research in Motion Ltd. in Support of Defendants' Motion for Sanctions and to Compel Further Patent Rule 3-1 Patent Infringement Contentions, dated March 20, 2007, attached as Ex. 12, the BlackBerry model 5790 does not contain, nor has it ever contained an Intel "PDCharm" chipset. *See id*. at 4. However, the correct chipset for the BlackBerry model 5790 can be determined simply by obtaining that publicly-available model and removing the cover. *See id*. at ¶ 6. The identity of the correct integrated circuit chip can be easily discerned with the naked eye. *See id*. Moreover, the identity of the correct chipset can be determined by checking other publicly-available sources. *See id*. at ¶ 8.

- As to GM, Plaintiffs' Supplemental PICs identified three different chipsets that are allegedly included in the GM OnStar[TM] System. Plaintiffs' Supplemental PICs demonstrate that Plaintiffs did not undertake any investigation with respect to GM's products prior to filing this lawsuit, or thereafter. Specifically, Plaintiffs stated in their Supplemental PICs for GM that "the OnStar™ System has been manufactured and delivered incorporating the Qualcomm® MSM6100 chipset solution," "the Qualcomm® MSM5100 chipset solution," and "the Qualcomm® MSM6050 chipset solution." The OnStar™ System never used the Qualcomm® MSM6100 chipset solution.[13] The OnStar™ System never used the Qualcomm® MSM6050 chipset solution.[14] And at no time during the period of enforcement of the '297 patent has the OnStar™ System used the Qualcomm® MSM5100 chipset solution.[15]

- Plaintiffs' Supplemental PICs also reflect that Plaintiffs are withholding facts and information in their possession from GM. During the meet and confer between GM and the Plaintiffs on February 5, 2007, the Plaintiffs provided detailed and specific technical information about the operation of the OnStar™ System and how it infringed the '297 patent. For example, Plaintiffs informed GM that the CDMA transceiver used in the OnStar™ System operated in a simplex fashion when sending data along one of the duplex channels used by the CDMA. Plaintiffs confirmed to GM that this theory would be included in their Supplemental PICs for GM. However, this theory was not even mentioned in the Supplemental PICs to GM. GM expressly offered to confer with the Plaintiffs once more after the first meet and confer (and before the Court's February 15th deadline) to ensure compliance with the Local Patent Rules and the Court's Order.[16] The Plaintiffs declined. Their cooperation would have potentially solved this omission, and resulted in more acceptable PICs this time around.

As the Court can see, instead of narrowing and focusing the parties' dispute, Plaintiffs' Supplemental PICs actually have had the opposite effect and expanded the dispute.

### C.    Plaintiffs' Repeated Failures To Properly Investigate Their Claims

On March 12 and 13, 2007, the Defendants sent letters to Plaintiffs' counsel demanding that the Supplemental PICs be revised to comply with the Court's January 31, 2007 Order.[17]

---

[13] Declaration of Matthew G. Przybylski In Support of Defendant' Motion for Sanctions and to Compel Further Patent Rule 301 Patent Infringement Contentions, dated March 16, 2007 at ¶ 4, attached as Ex. 13.

[14] *Id.* at ¶ 6.

[15] *Id.* at ¶ 5.

[16] Letter from Richard D. Watkins to Philip P. Mann, dated February 6, 2007, attached as Ex. 14.

[17] Letter from Todd E. Landis to Philip P. Mann, dated March 12, 2007, attached as Ex. 15; Letter from Richard D. Watkins to Philip P. Mann, dated March 12, 2007, attached as Ex. 16; Letter from Robert F. Perry to

Plaintiffs did not respond, so Defendants sent Plaintiffs' counsel an e-mail on March 19, 2007 to confirm that the parties had adequately met and conferred on the issue.[18]   That same day, Plaintiffs' counsel finally responded on the subject.[19]

In their response, Plaintiffs stated their unwillingness to seek out all available information concerning the representative accused products identified by Defendants.

> Those models identified by Defendants for which the chipset could not be reasonably determined from publicly available information could not be addressed.  This of course does not mean that those models do not include a CDMA chipset for which Plaintiff has an equally detailed analysis, only that Plaintiffs cannot know which analysis is applicable until the Defendants identify which chipsets are in each model.  **If the Defendants would just provide us with the information about which chipset is used in each product, then Plaintiffs could map the claim charts provided to each product, or supplement the claim charts for products that use a different chipset.**

This paragraph reveals one certain truth – Plaintiffs' lawsuit is a sham.  It is clear from the above paragraph that Plaintiffs had absolutely no basis for accusing Defendants' products of infringing the '297 patent.  Plaintiffs cannot identify the chipsets used in each of the accused products.  The chipsets are the crux of Plaintiffs' case, and Plaintiffs have no idea what chipsets are used in what products.

Plaintiffs have refused to perform even the simplest of investigations in order to satisfy their obligations under the Rules of the Court, and under the Court's January 31 Order.  Plaintiffs had options available to discover the chipsets used in each accused product.  For example, with respect to Samsung, Plaintiffs could have simply purchased the accused Samsung phones,

---

Philip P. Mann, dated March 12, 2007, attached as Ex. 17;  Letter from Peter J. Chassman to Philip P. Mann, dated March 12, 2007, attached as Ex. 18;  and Letter from Scott W. Hejny to Philip P. Mann, dated March 13, 2007, attached as Ex. 19.

   [18] E-mail from Peter Chassman to Philip P. Mann, dated March 19, 2007, attached as Ex. 20.

   [19] Letter from Philip P. Mann to Peter Chassman, dated March 19, 2007, attached as Ex. 21.

removed the housing, and immediately identified the chipset being used by the phone.[20]  The same was true for the RIM products.[21]  All 16 identified Samsung phones are available for purchase either at a retail location or through the internet.[22]

Plaintiffs have simply refused to seek and utilize publicly available information, in order to satisfy their obligations.  Instead, Plaintiffs tried to shift their burden onto Defendants.

> [T]he particular chipset used in each specific product cannot be reasonably discovered through publicly available sources.  Accordingly, until Defendants deliver to us information that identifies which particular chipsets were used in which particular products, the claim charts that have been delivered cannot be more meaningfully supplemented.  Only the Defendants know with particularity which chipsets are used in each product.  This is information that is available to you and it should not be difficult for the Defendants to provide it.[23]

Plaintiffs have admitted that, they have no idea of the components of Defendants' products or how such products could infringe the patent, which begs the question – "What basis did Plaintiffs have for bringing their lawsuit?"  Clearly, the answer is "none."  Plaintiffs' "investigations" are simply not sufficient under the Patent Rules or FED. R. CIV. P. 11.  Plaintiffs were obligated to perform and could have performed, substantially more investigation before filing this lawsuit.  Even when the Court gave Plaintiffs a second chance, they still failed to satisfy their obligations, and this has cost the Defendants both in money and in disruption to business, in what appears to be a baseless lawsuit.

---

[20] Declaration of Kyonghwa Chong In Support of Defendant' Motion for Sanctions and to Compel Further Patent Rule 3-1 Patent Infringement Contentions, attached as Ex. 22.

[21] Declaration of Omar Barake at ¶ 6.

[22] Declaration of Thomas William Kennedy, Jr. In Support of Defendant' Motion for Sanctions and to Compel Further Patent Rule 3-1 Patent Infringement Contentions, attached as Ex. 23.

[23] Letter from Philip P. Mann to Peter Chassman, dated March 19, 2007, attached as Ex. 21.

D.    **Plaintiffs' Actions Warrant Sanctions**

A district court may dismiss an action for failure to prosecute or to comply with any order of the court.[24]  The exercise of the power to dismiss a case for failure to prosecute or obey a court order is committed to the sound discretion of the Court and appellate review is confined solely in whether the Court's discretion was abused.[25]  Not only may a district court dismiss for want of prosecution upon motion of a defendant, but it may also, *sua sponte*, dismiss an action whenever necessary to achieve the orderly and expeditious disposition of cases.[26]  Dismissal with prejudice for failure to obey an order or failure to prosecute is an extreme sanction which should be employed only when the "plaintiff's conduct has threatened the integrity of the judicial process [in a way which] leav[es] the court no choice but to deny that plaintiff its benefit."[27]  Plaintiffs have deliberately and inexcusably failed to comply with the Court's January 31 Order.  Plaintiffs have provided no explanation for their failure to comply, and in the case of Rockwell, outrightly refuse to comply at all, needlessly costing each Defendant time and money.  Such actions by Plaintiffs should be sanctioned as they threaten the integrity of the judicial process and this Court.  In this instance, Plaintiffs' refusal to comply with this Court's Order and their blatant misrepresentation to the Court concerning their intention to comply should bring about severe consequences.  Defendants respectfully asks the court to issue an order that includes:

---

[24] *Aberegg v. Sabal*, No. 4:06-CV-437, 2007 WL 295636, at *1 (E.D. Tex. Jan. 29, 2007) (citing *McCullough v. Lynaugh*, 835 F.2d 1126 (5th Cir. 1988));  FED. R. CIV. P. 41(b).  The cited slip opinion is attached as Ex. 24.

[25] *Id.* (citing *Green v. Forney Eng'g Co.*, 589 F.2d 243 (5th Cir. 1979);  *Lopez v. Aransas County Indep. School Dist.*, 570 F.2d 541 (5th Cir. 1978).

[26] *Id.* citing *Anthony v. Marion County Gen. Hosp.*, 617 F.2d 1164 (5th Cir.1980).

[27] *Id.* citing *McNeal v. Papasan*, 842 F.2d 787, 790 (5th Cir. 1988) (citing *Rogers v. Kroger Co.*, 669 F.2d 317, 321 (5th Cir. 1982)).  A court should consider lesser sanctions, such as fines, costs, damages, conditional dismissals and dismissals without prejudice, among other lesser measures, prior to dismissing a case with prejudice.  *Id.* citing *McNeal* at 793.

1.      The order should limit Plaintiffs' infringement allegations in the case to only the accused products for which Plaintiffs' provided claim charts in their Supplemental PICs. Accordingly, the order should relieve Defendants from their obligations to provide discovery on any products for which Plaintiffs did not provide a specific, detailed claim chart.

2.      As to the PICs that Plaintiffs have provided, going forward, the order should: a) preclude Plaintiffs from pursuing discovery or infringement allegations as to anything other than the specific devices and/or components (instrumentalities) specifically identified in their Supplemental PICs as meeting each claim element; b) preclude Plaintiffs from amending or adding additional instrumentalities; and c) relieve Defendants from an obligation to produce discovery on any instrumentalities other than those specifically identified in Plaintiffs' Supplemental PICs.

## IV.     Motion to Compel Further Supplementation of the Supplemental PICs

Defendants respectfully request that the Court order Plaintiffs to revise their Supplemental PICs to provide clarity where Plaintiffs' Supplemental PICs are vague.  This request is ***only as to the specific products and specific instrumentalities identified in Plaintiffs' Supplement PICs.  Plaintiffs should not be allowed to provide any further PICs with respect to any of the 62 identified products for which they did not initially provide Supplemental PICs.*** Otherwise, Plaintiffs will effectively receive the 4 to 6 week extension of time for supplementing their original PICs, the time frame the Court denied, by disregarding the Court's Order and their own representations to the Court that they would provide charts for all 62 identified products by March 9, 2007.

### A.     Plaintiffs' Supplemental PICs Still Do Not Comply with P.R. 3-1

Local Patent Rule 3-1 requires a plaintiff to detail (a) "each claim of each patent in suit that is allegedly infringed by each opposing party; (b) separately for each asserted claim, each

accused … product … ('Accused Instrumentality') of each opposing party of which the party is aware"; (c) a chart *identifying specifically where each element of each asserted claim is found within each Accused Instrumentality*."[28]   In satisfying these requirements, it is not sufficient to provide "vague, conclusory language or simply mimic[] the language of the claims."[29]   Instead, the charts are required to set forth "'specific theories of infringement.'"[30]

> In *ConnecTel*, Judge Davis explained the reasons specific PICs are required by P.R. 3-1:

> Specific theories create a specific trajectory for the case.  When parties accuse hundreds of products of infringing hundreds of claims, and only narrow those accusations after discovery, the case staggers for months without clear direction.  However, when parties formulate, test, and crystallize their infringement theories before stating their preliminary infringement contentions, as the Patent Rules require, the case takes a clear path, focusing discovery on building precise final infringement or invalidity contentions and narrowing issues for *Markman*, summary judgment, trial, and beyond.[31]

Plaintiffs' Supplemental PICs, like their original PICs, fall woefully short of these standards, and in fact, cause the harms identified in *ConnecTel*.

Plaintiffs' Supplemental PICs provide no more clarity as to how each of the Defendants' accused products allegedly infringe the asserted claims than did Plaintiffs' original PICs.  For many of the elements of the asserted claims, Plaintiffs have simply repeated the insufficient statements from their original PICs.  For other elements, Plaintiffs have changed the language from the original PICs but have failed to provide any further clarity as to where those elements are found in the accused products.  Indeed, in many ways, Plaintiffs' Supplemental PICs provide *less clarity than their original PICs*.  In order to demonstrate the continued deficiencies with Plaintiffs' PICs, Defendants provide a few examples below from Plaintiffs' Supplemental PICs.

---

[28] Local Patent Rule 3-1 (emphasis added).

[29] *ConnecTel, L.L.C. v. Cisco Sys., Inc.*, 391 F. Supp. 2d 526, 528 (E.D. Tex. 2005) (quoting *STMicroelectronics, Inc. v. Motorola, Inc.*, 308 F. Supp. 2d 754, 755 (E.D. Tex. 2004)).

[30] *Id.* at 527.

[31] *Id.*

1.    **Limitation from claim 1: "An interface to connect a data transfer device with a radio transceiver"**

This limitation requires, at a minimum, an interface, a data transfer device, and a radio transceiver.  In their Supplemental PICs, Plaintiffs again fail to provide any specificity as to the specific devices that the Plaintiffs believe satisfy the limitation of "data transfer device."  In fact, the original PICs and the Supplemental PICs are equally vague, as can be seen by the comparison chart below.

| "Data Transfer Device" Original PICs | "Data Transfer Device" Supplemental PICs |
| --- | --- |
| each accused instrumentality includes a data transfer device such as a user-actuable keyboard or other data source.[32] | The accused device includes several components, any one or more of which constitute a data transfer device.  In one example, the accused device includes at least a keyboard, which is a data transfer device. Other components coupled to the identified chipset may also constitute a "data transfer device", such as any one or more devices connected to the "Connectivity" portion of the identified chipset below.[33] |

As the Court can easily see, Plaintiffs have provided equally vague language in their Supplemental PICs as in their original PICs.  As seen above in the Supplemental PICs chart, Plaintiffs identify one specific device, a keyboard.  Plaintiffs then state that other components "may" also constitute a "data transfer device", and identify a point of connectivity for these "other components."  Plaintiffs never attempt to clarify what devices constitute these "other components."  Plaintiffs also never attempt to clarify when one of these "other components" might constitute a "data transfer device" and when they might not.  Instead, the Defendants are

---

[32] This language is similar for all Defendants.  Plaintiffs' original PICs for all Defendants are attached as Exs. 13-18.

[33] This language is similar for all Defendants except that the specific device, *i.e.*, keyboard, may be a different device and the point of connection, *i.e.*, "connectivity," varies depending upon the chipset.

essentially left to guess as to which devices within the accused products "may" constitute a "data transfer device."

> 2. **Limitation from claim 1: "a data bus to transfer one of said data signals between said device and the respective circuit"**

This limitation requires a data bus that handles both incoming and outgoing communications to and from the data transfer device. Plaintiffs' original PICs described the "data bus" as follows:

> Each of the [Samsung] accused instrumentalities includes a data bus that operates to transfer receive data from the data transfer device to the receiving circuit and to transfer transmit data from the data transfer device to the transmitting circuit. In the accused instrumentalities, the data bus includes any of the dual memory buses and the general-purpose interface bus, the address/data microprocessor bus and internal buses linking all the functional blocks in the utilized chip set.[34]

This original language did not identify a single specific element that actually constituted the "data bus", but instead identified several "buses" that can be found associated with the accused products. In their Supplemental PICs, Plaintiffs describe the "data bus" element virtually identically for each of the Defendants and became even more vague.

> The identified chipset component includes a data bus within the MSM6100 chip that operates to transfer data between the data transfer device and the receiving circuit, and to transfer data between the data transfer device and the transmitting circuit.

> In the accused instrumentalities, the data bus is at least partially contained within the integrated circuit forming the MSM6100 chip as a series of etched conductive paths or links between the functional blocks illustrated below in the chip set. The data bus also further includes or couples to any of the dual memory buses, the general-purpose interface bus, the address/data microprocessor bus and other internal buses.[35]

---

[34] The language from Samsung's original PICs is used by way of example. The language for each of the Defendants is similar to the language presented here.

[35] The language from Samsung's Supplemental PICs is used by way of example. The language of each of the Defendants is similar to the language presented here.

If Plaintiffs' original PICs were vague in their description of the structure(s) that constitute the "data bus," then Plaintiffs' Supplemental PICs are nothing short of hopeless. Plaintiffs state that the "data bus is at least partially contained within the integrated circuit forming the MSM6100 chip as a series of etched conductive paths or links between the functional blocks illustrated below in the chip set." This language provides no explanation as to what components of the accused chipsets are part of the "data bus," and what components are not. There are literally thousands of "etched conductive paths" in every integrated circuit board. In fact, a circuit board is nothing more than a series of etched conductive paths used to connect electronic components. Thus, by describing the "data bus" as an "etched conductive path" on a chip, Plaintiffs avoid having to ever identify a specific path that would constitute the "data bus" within the accused instrumentalities of the Defendants. This again leaves the Defendants guessing.

To make matters worse, Plaintiffs stated that the "data bus" is "at least partially contained" within these etched conductive paths. Defendants are again left to wonder where the remainder of the "data bus" is located in the accused products, if it is not fully contained within the etched conductive paths. Plaintiffs then state that the data bus "includes or couples to any of the dual memory buses, the general-purpose interface bus, the address/data microprocessor bus and other internal buses." First, if the "data bus" couples to something, then that something clearly is not part of the "data bus." Second, Plaintiffs' statement that the "data bus includes or couples" to various other components takes an already impossibly vague description of "data bus" and makes it even worse. In essence, Plaintiffs' description of "data bus" allows them to choose from any electrical path that can be found within a chipset from any of the accused products and call it a "data bus." Defendants have absolutely no ability to know which electrical

paths from their devices fall within the "data bus" limitation, and which do not. Clearly, the Patent Rules were designed to avoid this type of gamesmanship.

> 3. **Limitation from claim 1***:* **"Switch means to connect one of said circuits with said data bus"**

Similar to the "identification" in Plaintiffs' Supplemental PICs for "data bus," Plaintiffs' Supplemental PICs relating to the "switch means" limitation are entirely deficient, hopelessly vague, and provide no further clarification beyond Plaintiffs' original insufficient PICs. Again, Plaintiffs' Supplemental PICs for the "switch means" limitation provide the Defendants with no guidance as to the specific structures within their accused instrumentalities that would constitute the "switch means." The Plaintiffs' original PICs and Supplemental PICs for "switch means" are reproduced in the comparison chart below.

| "Switch Means" from Original PICs | "Switch Means" from Supplemental PICs[36] |
|---|---|
| Each of the Samsung accused instrumentalities includes switch means that connects one of the receiving or transmitting circuits with the data bus. Each of the accused instrumentalities includes mechanical or electronic circuitry operable by making, breaking or changing the circuitry, for the purpose of isolating, blocking, routing and or conditioning of the data signals to connect the data bus with either of the receiving or transmitting circuits. The switch means is a microprocessor or DSP in the accused instrumentality executing the code that provides the logic for sending or receiving information to or from the respective receiving or transmitting circuit. The microprocessor under the control of the source code is a special purpose machine including various logic gates, such as AND gates, flip-flops and inverters that performs the function of the switch means. Such switch means along with the control | The accused instrumentalities include switch means that connect one of the receiving or transmitting circuits with the data bus. The identified chipset includes transistors and other logic gates for alternately coupling components of the chipset one to another for the purpose of isolating, blocking, routing and or conditioning of the data signals to connect the data bus with either of the receiving or transmitting circuits. The switch means comprises various logic gates and transistors that are in electrical cooperation with each of the various subcomponents of the identified chip set that perform the function of the switch means. These various logic gates and transistors function to effectively connect the transmitting circuit or the receiving circuit to the data bus. |

---

[36] The language from the original PICs and the Supplemental PICs is similar for all Defendants.

| means described below can be found in the BT 1.1 processor, the gpsOne processor, the GSMIGPRS processor and CDMA processor portions of the utilized chip set.  These processors function to effectively connect the transmitting circuit of the receiving circuit to the data bus, to control the operation of the bus connection according to the intended destination of the signal to of from the data transfer device, to follow the change in the operational mode, to disconnect the connection in the unwanted route, and to maintain the effective connection in the wanted route. | |
| --- | --- |

In their original PICs, Plaintiffs described the "switch means" as "mechanical or electronic circuitry operable by making, breaking or changing the circuitry, for the purpose of isolating, blocking, routing and or conditioning of the data signals to connect the data bus with either of the receiving or transmitting circuits."   In their Supplemental PICs, Plaintiffs use virtually the exact same language except that the Plaintiffs substitute "transistors and other logic gates" for "mechanical or electrical circuitry."   The insertion of "transistors and other logic gates" into this already vague description of "switch means" does nothing to clarify the specific components of the accused instrumentalities that allegedly constitute the "switch means".

Each of the Defendants' accused products use chipsets with microprocessors.  These microprocessors contain thousands if not millions of transistors, which in various configurations form logic gates.  Because there are millions of transistors in each of the chipsets used by each of the Defendants' accused products, Plaintiffs' description of the "switch means" within these accused products as "transistors and other logic gates for alternately coupling components of the chipset one to another for the purpose of isolating, blocking, routing and or conditioning of the data signals to connect the data bus with either of the receiving or transmitting circuits" is effectively meaningless, and provides no more guidance than Plaintiffs' original, insufficient

description of "mechanical or electronic circuitry."  Plaintiffs should accordingly be required to identify the specific transistors that constitute the "switch means."

     4.     **Limitation from claim 1: "and control means to control said switch means"**

Plaintiffs' blatant disregard for the Court's January 31 Order can be best seen with respect to this limitation.  In essence, Plaintiffs made no changes to their PICs with respect to "control means."  The minor changes that were made by Plaintiffs provide no further clarity as to the structures within each of the Defendants' accused products that would be considered the "control means."  To illustrate the lack of a good faith effort on the part of the Plaintiffs to comply with the Court's Order and the Patent Rules, the chart below shows a comparison between the original PICs and the Supplemental PICs as they pertain to "control means".

| "Control Means" from Original PICs | "Control Means" from Supplemental PICs[37] |
|---|---|
| Each of the Samsung accused instrumentalities includes mechanical or electronic circuitry operable to control the switch means, to connect one of the transmitting or receiving circuits with the data bus. | The accused instrumentalities include electronic circuitry operable to control the switch means, to connect one of the transmitting or receiving circuits with the data bus. |
| The control means is a microprocessor or DSP in the accused instrumentality executing the code that provides the logic for determining whether to connect one of the transmitting or receiving circuits with the data bus.  The microprocessor under the control of the source code is a special purpose machine including various logic gates, such as AND gates, flip-flops and inverters that performs the function of the control means.  Such control means along with the switch means described above can be found in the BT 1.1 processor, the gpsOne processor, the GSMIGPRS processor and CDMA processor portions of the utilized | The control means is a microprocessor or digital signal processor (DSP) in the accused instrumentality executing code that provides logic for determining whether to connect one of the transmitting or receiving circuits with the data bus.  The microprocessor is under control of the source code is a special purpose machine including various logic gates and transistors, such as AND gates, flip-flops and inverters, that perform the function of the control means.  Such control means along with the switch means described above can be found in the CDMA processor, the gpsOne processor, and the DFM processor portions of the chipset |

---

[37] The language from the original PICs and the Supplemental PICs is similar for all Defendants.

| | |
|---|---|
| chip set. | illustrated below. |
| These processors function to effectively connect the transmitting circuit of the receiving circuit to the data bus, to control the operation of the bus connection according to the intended destination of the signal to of from the data transfer device, to follow the change in the operational mode, to disconnect the connection in the unwanted route, and to maintain the effective connection in the wanted route. | These processors control the switching means to effectively connect the transmitting circuit of the receiving circuit to the data bus, to control the operation of the bus connection according to the intended destination of the signal to of from the data transfer device, to follow the change in the operational mode, to disconnect the connection in the unwanted route, and to maintain the effective connection in the wanted route. |

As with "switch means", the only real difference between Plaintiffs' original PICs and their Supplemental PICs with respect to "control means" is the insertion of the phrase "various logic gates and transistors" into the second paragraph of the description. Again, the addition of the phrase "logic gates and transistors" is effectively meaningless. As stated previously, the chipsets used in the accused products contain millions of transistors that in some combinations form logic gates. Certainly, Plaintiffs are not claiming that every transistor and every logic gate within the chipset designs used by the Defendants constitute the "control means". This obviously cannot be the case because the Plaintiffs have already stated that the "switch means" comprises transistors and logic gates within the chipset. Thus, Plaintiffs clearly believe that certain transistors are used for switching and certain transistors are used for controlling. Unfortunately, Plaintiffs have given no indication about which transistors are used for what.

Plaintiffs have not identified a single group of transistors that they believe constitute either the "switch means" or the "control means." Instead, Plaintiffs hedge their bets by vaguely stating that the "switch means" and the "control means" are comprised of "various" transistors and logic gates. This definition provides no guidance to the Defendants as to how their accused products allegedly meet these claim limitations. It further provides no guidance as to the specific location of the "switch means" and the "control means." In essence, the Defendants are left to

guess which needles in the vast haystack constitute the "switch means," and which constitute the "control means."  Infringement contentions, and Rule 11, are designed to prevent Defendants from having to engage in such a needless and frivolous exercise.

     **5.**     **Limitation from claim 1*:* "said control means being responsive to a signal from said data transfer device"**

As with "control means", the original PICs and the Supplemental PICs have virtually identical language with respect to this claim limitation.  The chart below illustrates this:

| "said control means being responsive to a signal from said data transfer device" from Original PICs | "said control means being responsive to a signal from said data transfer device" from Supplemental PICs[38] |
|---|---|
| In the Samsung accused instrumentalities, the control means responds to a signal from the data transfer device.  The signal comprises a change of state in one or more data bits that signals a change in the operational mode of the data transfer device. | In the accused instrumentalities, the control means responds to a signal from any one or more of the data transfer devices.  The signal comprises a change of state in one or more data bits that signals a change in the operational mode of the data transfer device and/or data ready to be transmitted or otherwise handled by the control means on behalf of the data transfer devices. |

As with the preceding claim elements, Plaintiffs continue to use vague, conclusory language when attempting to "read" the language of the claims on all of Defendants' accused devices.  Again, Plaintiffs do not identify a single specific device (or specific portion of a specific device).  Moreover, the claim language requires that the control means be responsive to a "signal from said data transfer device."  Plaintiffs' corresponding blanket statement provides no indication of what specifically in each of the Defendants' accused devices satisfies this claim element, or even how the signal is sourced from the "data transfer device" to the "control means."  Instead, this element is little more than a paraphrasing of the claim language: "control

---

[38] The language from the original PICs and the Supplemental PICs is similar for all Defendants.

means being responsive to a signal from said data transfer device, which is indicative of a change in the operational mode thereof."[39]  Again, Defendants are left to guess what specific structures or components in their devices are allegedly covered by this limitation.

> **6.    Limitation from claim 1:   "which is indicative of a change in the operational mode thereof"**

Like the previous limitations, Plaintiffs have simply repeated the insufficient description for this claim limitation from the original PICs.  Defendants again provide a comparison chart so the Court can see Plaintiffs' blatant disregard of their obligations under the Court's January 31, 2007 Order.

| "which is indicative of a change in the operational mode thereof" from Original PICs | "which is indicative of a change in the operational mode thereof" from Supplemental PICs[40] |
|---|---|
| In the Samsung accused instrumentalities, the signal from the data transfer device consists of one or more bi-stable digital bits having states of logic "1" and logic "0" indicative of a change in operational mode respectively. A change from logic "0" to logic "1" or vice versa indicates a change in the operational mode of the data transfer device. | In the accused instrumentalities, the signal from the data transfer device consists of one or more bi-stable digital bits having states of logic "1" and logic "0" indicative of a change in operational mode respectively.  A change from logic "0" to logic "1" or vice versa indicates a change in the operational mode of the data transfer device. |

Again, Plaintiffs simply paraphrase the language from the claim.  Plaintiffs do nothing more than provide a generic explanation of how it *might* be possible to indicate a change in operational mode.  The identification of a possibility is not sufficient under the Patent Rules.

The remainder of the charts in Plaintiffs' Supplemental PICs are equally vague.  These charts use similar broad, conclusory language, disconnected from any evidence, and further fail to identify any specific devices, structures, or components within the accused products.

---

[39] '297 patent, c.1 at 6:44-49.

[40] The language from the original PICs and the Supplemental PICs is similar for all Defendants.

**B.**    **The Lack of Specificity of Plaintiffs' Supplemental PICs Demonstrates That Plaintiffs Had No Basis For Accusing Any Products of Any of the Defendants of Infringement**

Plaintiffs' original and Supplemental PICs make one thing abundantly clear – Plaintiffs had no basis, and continue to have no basis for bringing the present lawsuit against any of the Defendants. It is clear that the Plaintiffs did nothing to investigate how any of the accused devices operate prior to filing the lawsuit, and now, in the face of the Court's Order, still refuse to perform a proper investigation and analysis. The Plaintiffs are wasting the Court's time and the parties' resources based upon frivolous allegations in the hope that the Court will ignore the Plaintiffs' deficiencies and allow them to conduct discovery to bridge the considerable gaps in their infringement theories. This is exactly the type of disingenuous activity that the Patent Rules (and FED. R. CIV. P. 11) are designed to prevent.[41]

The Patent Rules contemplate that a plaintiff will do significant pre-suit investigation so that he will be in a position to provide detailed PICs at the case's outset. Judge Davis described acceptable pre-suit diligence in *ConnecTel*:

> The plaintiff in [*American Video Graphics*] did not just allege infringement of hundreds of video games, submit those games' user manuals as evidence, and expect to narrow its claims upon receipt of source code. Before serving PICs, and indeed even before bringing suit, the plaintiff's experts played hundreds of video games to identify infringing graphic processes, and more importantly, to rule out many non-infringing processes. … The Court viewed plaintiff's pre-suit diligence with favor.[42]

Moreover, this pre-suit investigation requires a plaintiff to review publicly available information — such as the accused devices themselves, or, at a minimum, publicly available

---

[41] *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000) ("Rule 11, we think, must be interpreted to require the law firm to, at a bare minimum, apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted").

[42] *ConnecTel*, 391 F. Supp. 2d at 528 (citing *Am. Video Graphics, L.P. v. Elec. Arts, Inc.*, 359 F. Supp. 2d 558, 560-61 (E.D. Tex 2005)).

technical information about the accused devices: "When information is publicly available, the Patent Rules require plaintiffs to set forth specific theories of infringement at the outset of the case."[43]  In this case, Plaintiffs have apparently made no attempt to purchase any of the accused products and have them analyzed.  All of the accused products are readily available for purchase. In fact, Plaintiffs' counsel could purchase many, if not most, of the accused products from the Internet.

### C.    Plaintiffs Should Be Ordered to Supplement Their PICs Within Ten Days or Face Dismissal With Prejudice

Defendants request that the Plaintiffs be ordered to revise their Supplemental PICs only as to the products and chipsets initially identified in their Supplemental PICs.  As requested above with respect to Defendants' motion for sanctions, Plaintiffs should be limited in their infringement case to only the accused products and chipsets identified in their Supplemental PICs.  Defendants request that the Court order Plaintiffs to revise their Supplemental PICs with respect to these accused products and chipsets <u>only</u>, and that Plaintiffs be precluded from submitting any further PICs with respect to any other accused products or chipsets.  The Defendants request that the Court order Plaintiffs to provide claim charts detailing the specific structures within each of the products and chipsets identified in the Supplemental PICs that allegedly meet each element of the asserted claims of the '297 patent.  Defendants also request that the Court order such compliance within 10 days, and that the Court impose an alternative sanction of dismissal with prejudice should Plaintiffs fail to comply.  Plaintiffs obviously have little regard for the rules of this Court, and have thumbed their noses at the process established by this District.  It is now time that the Plaintiffs be required to comply or face dismissal.

---

[43] *Orion IP, LLC v. Staples, Inc.*, 407 F. Supp. 2d 815, 817 (E.D. Tex. 2006) (citing *Am. Video Graphics*, 359 F. Supp. 2d at 560).

V.     <u>**Conclusion**</u>

For all the reasons stated above, the Court should impose the sanctions requested by the Defendants limiting the case to those specifically accused products in the Supplemental PICs and also order Plaintiffs to supplement their most recent PICs within 10 days or have their action dismissed.  Defendants respectfully request any further relief the Court deems just and proper.

Dated:  March 20, 2007              Peter J. Chassman
                                            HOWREY LLP
                                            1111 Louisiana, 25th Floor
                                            Houston, TX 77002
                                            Tel (713) 787-1623
                                            Fax (713) 456-2055

                                            _____/s/ Peter J. Chassman_____
                                            Attorneys for Defendant RESEARCH IN MOTION CORPORATION

Dated:  March 20, 2007              Robert F. Perry
                                            KING & SPALDING
                                            1185 Avenue of the Americas
                                          New York, NY 10036-4003
                                          Tel (212) 556-2100
                                          Fax (212) 556-2222

                                            _____/s/ Robert F. Perry_____
                                            Attorneys for Defendant NOKIA, INC.

Dated:  March 20, 2007              Jonathan E. Retsky
                                              BRINKS HOFER GILSON & LIONE
                                          NBC Tower, Suite 3600
                                          455 North Cityfront Plaza Dr.
                                          Chicago, IL 60611-5599
                                          Tel (312) 222-8111
                                          Fax (312) 321-4299

                                            _____/s/ Jonathan E. Retsky_____
                                          Attorneys for Defendant GENERAL MOTORS CORPORATION

Dated:  March 20, 2007

Todd E. Landis
AKIN GUMP STRAUSS HAUER & FELD, LLP
1700 Pacific Avenue
Dallas, TX 75201
Tel (214) 969-2800
Fax (214) 969-4343

_____/s/ Todd E. Landis_____
Attorneys for Defendant SAMSUNG
TELECOMMUNICATIONS AMERICA LP

Dated:  March 20, 2007

Steven J. Pollinger
MCKOOL SMITH, P.C.
Suite 1700
300 West 6th Street
Austin, TX 78701
Tel (512) 692-8702
Fax (512) 69-8744

_____/s/ Steven J. Pollinger_____
Attorneys for Defendant KYOCERA
WIRELESS CORPORATION

## CERTIFICATE OF CONFERENCE

The parties conferred regarding the above motion via written communications on March 19, 2007.  Counsel for Plaintiffs indicated that Plaintiffs would oppose this motion.

/s/ Todd E. Landis_____
Todd E. Landis

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of March 2007, a true and correct copy of the foregoing Defendants' Motion for Sanctions and to Compel Further Patent Rule 3-1 Patent Infringement Contentions was sent by ECF to counsel of record for Plaintiffs.

/s/ Todd E. Landis_____
Todd E. Landis